Lion Capital LLP Mr. Shaw May it please the court, my name is Pratik Shaw and I'm appearing on behalf of Appellant Stone Lion Capital Partners LLP. The trademark trial and appeal board below found the likelihood of confusion in granting Lion Capital's opposition to registration of the Stone Lion Capital mark. But in doing so, the board refused to give effect to the undisputed record evidence establishing the highly sophisticated and highly regulated nature of the participants and transactions in which both parties engage. And it also refused to give effect to Appellee's critical concession that point of sale confusion was thus virtually inconceivable. That refusal contradicts the CCPA's mandate in the seminal DuPont decision to consider the entire record including actual marketplace conditions and thus constitutes reversible error. Now to defend the board's decision, Appellee advances two main arguments. First they argue the record evidence in Appellee's related concession refuting any risk of point of sale confusion are irrelevant as a matter of law. And they also argue that confusion might arise other than at the point of sale. Let's go back to your argument here on the concession on confusion at the point of sale. But our case law tells us also that though we don't need to, we can address the initial interest confusion. Is there any confusion at the outset amongst investors when they're considering to invest? The initial interest? Your Honor, there's no record of initial interest confusion in this case. And I think critically the board did not rely on any rationale of initial interest confusion or make any findings of initial interest confusion. What the board said is we're going to assume the least sophisticated consumer or investor and we don't find any sort of confusion. And I think it's good reason, well first let me say the fact that the board didn't rely on such confusion sort of ends the matter there. If we look at the Supreme Court's decision in Chenery, well-established administrative law principles that this court has adopted say you don't affirm an agency's decision on rationales or findings that the agency didn't consider. But even if we were to go beyond that, there's good reason that the board did not rely on or make any findings relying on initial interest confusion or the other forms of confusion that Apley alleged. And that's because this court has never embraced initial interest confusion in a Section 1052D registration action. It said we do not embrace initial interest confusion, we're going to save it for another day, and we don't follow that concept. This would be a uniquely poor vehicle for this court to break new ground and address initial interest confusion where the board hasn't addressed it and where the record doesn't support that theory as well. And the sort of cases that the other side relies on when it talks about these other types of confusion, initial interest confusion or the other types of confusion that it has not conceded, those are trademark infringement cases in other circuits that have recognized in the trademark infringement context some of these other forms of confusion. They've relied principally on the Morningside case from the Second Circuit. That was very different in a couple of ways. Legally it was different because Morningside was a trademark infringement action, not a Section 252D registration action. And factually it's quite different because for two reasons. One, in that case the marks were identical or much more similar than here. It was Morningside Capital and Morningside Group. And second, there was actual evidence of confusion of one investor, some investors calling the company and mistaking it for the other. You've got a pretty detailed opinion here that is dealing with the similarity of marks, the channels of trade, the strength of the marks, the sophistication of consumers. How would this court tamper with what is a lot of factual findings? Well, the critical error that the board made is it did not give any effect to the mountain of factual evidence that's basically undisputed in this case. That investors that engage both of these two parties are highly sophisticated investors in highly sophisticated transactions that leave no risk of confusion. The ultimate test under Section 252D is whether there is a likelihood of confusion. And if we focus on point-of-sale confusion, the only type of confusion that this court has recognized in a 1052D context, the other side has conceded it's virtually inconceivable. Now, the board acknowledged that that evidence was there in the record, but what it said is the board could not give it any legal effect because the board was constrained to the four corners of the application. They didn't ignore that. They dealt with it very specifically and said even sophisticated consumers can be confused by a flurry of marks that are similar. Sure. Two things, Your Honor. Do you exclude ordinary consumers seeking investment services? Do we exclude it in the application? No, Your Honor. No. Do you exclude them from doing business with you? Right. In the marketplace, Stoneline Capital does not engage with ordinary consumers. They engage in highly sophisticated... So somebody walks by your office, sees the lion on the door, and decides they want to invest some money. Come walking in, you throw them out the door. Right, Your Honor. Both parties would throw them out the door, to use your phrase, Your Honor, because both parties have high dollar minimums. They only engage in very high-end transactions, so institutional investors, high net worth investors, not your retail investing. But back to the point, the board dealt with that very directly. They said, yes, sophisticated customers, but there's still too much similarity in the marks, too much likelihood of confusion. Well, Your Honor, I don't think that's quite right. What the board said is, when anyone is investing, even ordinary investors, you are right, Chief Judge Rader, even ordinary investors are going to exercise diligence and care when making investments. But what it did not give effect to, and what it did not dispute, and neither did the other side dispute, is that when you're talking about the type of transactions that these two entities engage in, those are not just ordinary investors. Those are the most sophisticated investors. But the key is, you have, as they go on to say, applicants' identification of services, and they're identical. Why couldn't you just, as you suggest in your brief, you actually hit a different class to some degree. Why couldn't you change your identification of services? Sure. A couple of responses. First, Your Honor, the PTO's guidance in this area is against adding unnecessary restrictions into the application. They say to use clear and succinct language. If you look at the Trademark Examining Procedures Manual, Section 1402.1 instructs that the description should be understandable to the average person, should not require an in-depth knowledge of the field. The Board precedent says in permitting registration to be attacked simply on grounds that statements of goods and services are overbroad is at odds with PTO practicing of encouraging applicants to set forth descriptions of goods in broad terms. And in fact, StoneLion Capital, when it shows... So you're telling me you wanted to cover exactly the same services as Lion Capital. Yes, Your Honor. We were following the Trademark Manual guidance. You didn't want to distinguish your services from theirs. That's right. Then why didn't you choose a different name? Why did you choose a name that, to some degree, cozies up to theirs? Well, Your Honor... A lion is, of course, a wonderful symbol, but it's already used about six times. Blue lion, roaring lion. Right. And, Your Honor, the fact that it's been used already about six times, and we would say much more, shows that lion itself is not a strong mark that is distinctive in this industry. And, Your Honor, the name of our client is not Lion Capital. But why don't you choose something else? There are other... Well, Your Honor, they chose... It could be a tiger or an elephant or a cobra. As a practical matter, they chose stone lion instead of those, because they're located across from the New York Library that has the stone lion. But to engage you on similarity of marks... Why didn't you call it Patience and Fortitude? They chose stone lion for the reason that I told you. But if we get back to the description of services, which I think was sort of your primary legal point... Yes, it was. We don't dispute that under factors two and three of the DuPont test, that is, when you're looking at the description of services and description of trade channels, we don't dispute that they're identical. Those two factors go in the other side's favor. What we're focusing on is the conditions of sale and consumer sophistication factor. Is the TTIP incorrect? I asked you a question before, and you said you'd throw them out the door. It says, the services offered by the parties, as identified in their respective application and registrations, are not restricted to high-dollar investments or sophisticated consumers. Rather, applicants' investment advisory services and opposers' capital investment consultations could be offered to and consumed by anyone with money to invest, including ordinary consumers seeking investment services. Exactly right. Is that not true? No, that is correct, as described in the application. The record is completely clear, and the other side does not dispute, that both parties would not engage that sort of investor, even though both applications, the registration and application, are technically open to those. In practice, and this is why it's critical that we look at the record evidence of actual marketplace conditions, in practice, neither party would entertain that. They only agile with the wealthiest individuals. Why did you say that in the application? Like I said, PTO guidance does that, and that's for a practical reason. It becomes unwieldy. Don't you respond to it? They're saying it's identical, and you're not limiting yourself to what you actually want to do. Why didn't you limit yourself? Two responses, Your Honor. One, it becomes unwieldy and, in fact, contradicts guidance. To put in things like, it's a highly sophisticated consumer base, there's a pre-existing relationship, it's a long investment cycle, we only deal with individuals with high dollar minimums. That becomes unwieldy, and that's not something the Board wants in applications. But, to answer your question, the DuPont test accounts for this situation. Factors two and three go their way, because I agree with you completely. You look at the application, and the application services identified are identical, and the trade channels are identical. But when you get to conditions of sale and consumer sophistication, DuPont is absolutely clear that the takeaway from DuPont is you do not ignore record evidence. Even if we gave you that, we'd still have the Board balancing against you. Well, Your Honor, here's why I think the balancing would overwhelmingly favor us, if you actually gave effect to the undisputed record evidence and to their concession that confusion is virtually inconceivable. That is because the ultimate inquiry is whether there is a likelihood of confusion If, based on the record evidence, confusion is virtually inconceivable, that ends the inquiry. This is a balancing test, and if one factor is conclusive on that test, then that ends the inquiry. And on that point, the DuPont decision itself was very similar there. It was a party, and here's what DuPont said. I want to save your rebuttal time, Mr. Shaw. Sure, Your Honor. I'll just leave you with this one point, and I'll take it off my rebuttal time. DuPont, at page 1363, says this. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't. A mere assumption that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not. And I'll add one other point, realizing it'll come out of my rebuttal time, is this. If we adopted Athelie's test, that you were limited to the four corners of the application, not only for factors two and three, but also for conditions of sale, DuPont itself would have come out differently. And that is clear, because in DuPont, you not had similar names. You had the exact same name, Rally for Car Detergent, Rally for All-Purpose Detergent. The descriptions in the application were completely overlapping. The reason DuPont came out differently is because it looked at a market agreement where they said they were going to, in practice, advertise to different consumer bases that the all-purpose detergent wouldn't advertise to car retail stores. And because of that specific practical evidence outside the scope of the application, the court said no likelihood of confusion. DuPont would have come out differently under their test, and that's why you shouldn't adopt it. Thank you, Your Honor. Thank you, Mr. Shaw. Mr. Chiappetta? Mr. Chiappetta, does your client concede there's no likelihood of confusion? Absolutely not, Your Honor. To be very clear, my client's concession was that if a party was to undergo the entire due diligence process entailed by one of the party's funds, they would not get all the way to the end of that thinking they were dealing with the other party. At some point along the way, any confusion would be dispelled. But that's irrelevant for a couple of reasons. Why is that? Because the sophistication of the investor increases as you get down further into the process? What are you doing? Wheeling out the unsophisticated investors? No, I mean, the supposition in this hypothetical is that the investor is confused at the outset, and then they sit down. When they get in the door, they have an interview with one of the parties, and then at some point along the line, they realize, oh, wait, this is not the hedge fund that I thought it was. This is somebody else, or vice versa. It's a 30-day due diligence period. So my client does not dispute that there just wouldn't be confusion and would carry all the way through that 30-day period. But that's ignoring what's at issue in this case. What's at issue in this case is it's somewhat narrow. It's StoneLine Capital's application to register its mark in connection with all investment advisory services. It's unlimited. If they get a registration, they will have a presumptive right. That registration will qualify as prima facie evidence of its right to use its mark in connection with all investment services. That presumption would not be limited to their current hedge fund. It would not be limited to super wealthy investors or the SEC regulations. Why is StoneLine different from BlueLine? First, their mark is StoneLine Capital. Our mark is Lion Capital. And there is an existing mark, BlueLine. Why is BlueLine allowed and StoneLine not? Well, first, there's a couple of reasons. Or Roaring Lion. Or Lion Hound. There's no evidence. Or Lioness Capital. Or Lion Chemical Capital. There's about six lions out there. There's no evidence of that. Why does StoneLine get nailed and not BlueLine? The answer to that is that there is no evidence that there is third-party use. As the board found, there was only evidence of two marks. And that was Lion Chemical Capital and BlueLine Capital. And the evidence was scant as to the extent of the use of those marks. And why is BlueLine the same as StoneLine? Well, I'm not saying necessarily that it isn't as problematic. It very well may be. It's not incumbent upon a trademark owner to go after each and every single third party using a similar mark. The law recognizes that mark owners have limited resources and they can go after one at a time if need be. The point is that there's only two. And the board correctly found, in accordance with well-established precedent, that two instances where the extent of that use is in question is not sufficient to render the third-party marks factor to favor StoneLine Capital. So it concluded that this factor was, in fact, neutral. It didn't find one way or another that it favored either party. In fact, it's worth noting that... Why wouldn't it favor StoneLine? I still haven't heard an answer to my question, what's the difference between StoneLine and BlueLine? You're just saying we want to get StoneLine, we don't care about BlueLine. No, I'm not saying we don't care about BlueLine. It may be the case, depending on the facts and circumstances surrounding BlueLine's use of its mark, it may be the case that they will go after that party. It may be the case, look at the evidence, that BlueLine Capital is virtually unknown and therefore it's not a significant concern. You have to bear in mind that third-party use is only a problem to the extent that those marks are used in commerce and to the extent that those marks are affecting the way consumers perceive the party's marks. Even StoneLine Capital's COO, who's been in 20 years in some of the most prominent investment firms, said that she had never heard of BlueLine Capital. This is not a problem, this might not be a problem for my client. What is a problem and what is at issue in this case is StoneLine Capital, but not just StoneLine Capital, their application. Now this argument that they keep putting forward, that you need to consider the due diligence, you need to consider the SEC regulations, you need to consider all these extra application concerns, is the exact same argument that was put forth in Octocom Systems versus Houston Computer Services. This court and the board has addressed this issue many times over the last few decades, this issue being when there's a difference between the goods and services in an application and the goods and services that the parties are actually putting out there. And in Octocom, the appellant was sanctioned for the very same argument that StoneLine Capital is making here today. This court concluded that the appellant was blindly disregarding long-established authority. What's the blind... Well, I'll tell you. In that case, the appellant had an application... No, you're accusing your brother counsel here of disregarding authority. What authority are they disregarding? The ample authority that what is at issue in an opposition proceeding is the identification set forth in the application regardless of how the parties may actually be using their goods. This court is not, the board and this court cannot read into an application some limitation that's not on the face of the application because the application gives rise to presumptions, to prima facie arguments. If Shaw didn't want to amend, he didn't want to say they're doing something different, he was very forthright in saying we wish to have the entire scope of what we've applied for. That's right. So what's your problem? They cannot run from that. My problem is then what's at issue in this case is all investment advisory services. They're taking issue with the sophistication of consumers. Who are those consumers of all investment advisory services? As the board correctly noted, anybody with money to invest. That is the issue. The issue is what this application and the registration they would issue from it, these extra application factors that they keep trying to bring into this case. So in that court, as this court just ten minutes ago noted, Stonemine Capital argues that the board ignored all this evidence of consumer sophistication, extra application considerations. In the Octocon case, the court said no, the court did not ignore that evidence. It just concluded properly in accordance with well-established precedent that that evidence is irrelevant to the issue, namely the issue of what is in that application. Their application in that case was for modems. They were saying, oh, but you have to consider our consumers, these are high-end modems, and they're sold to very sophisticated consumers, and they're sold under conditions. The board put this in issue. The board says careful or sophisticated purchasers are not immune from confusion. So they seem to be saying, yes, there are sophisticated consumers here, but they're not immune from confusion. That's right, and that's been our position throughout this. That runs contrary to everything we have done in saying that sophisticated consumers, by their nature, are more discerning as to source denotation and better at making distinctions. I think if you look at what the board said, the board didn't actually say that the consumers, the relevant consumers here are sophisticated. They said everybody takes care with how they spend their money, how they invest their money. They also say, in the paragraph above I quoted, they say anybody is offered this service, including ordinary consumers seeking investment services, and then they say, although even ordinary consumers will exercise care, sophisticated purchasers are not immune. But they're saying ordinary purchasers, ordinary consumers may be under the application, may be using this service. That's right, so you have to take them into account as well as the party's actual consumers who may be wealthy investors with $5 million portfolios. But you have to take into account anybody who's willing to invest money, somebody who's filling out a 401k form and sees a mutual fund. If tomorrow, Stoneline Capital was to go out and start a mutual fund or a college tuition fund, a registration that issues from this application would cover those services. So anybody, any employee at any place of business who's filling out a 401k form, they are to be considered within this group of investors. They criticize the board for coming up with a hypothetical class of ordinary investors, but that's precisely what the board is charged with doing, determining who are the investors of, look at the application, investment advisory services, management of investment funds without limitation. And then further on the point of sophistication, the board also noted, it said that even careful or sophisticated purchasers are not immune, as you noted. But then it took into account the fact that the marks are similar. The services are legally identical. The trade channels and target consumers are legally identical, points which Stoneline Capital does not dispute. So on balance, considering that human memories are not infallible, any sophistication, whatever that may be, of an ordinary investor with money to invest who might take care of his money, it just is not enough to overcome these overwhelming factors that favor a finding that confusion is likely. And then I really want to turn attention to one other factor that Stoneline Capital addressed in its brief but didn't address today, and that's the similarity of the marks. I think it's important to address because they make a major mistake. If they didn't address it today, why would you want to address it? Well, what I want to address is a mistake in the burden of proof. I'm sorry, in the standard of review that they put in their brief. I'm giving you a hint. Yeah, okay. Much appreciated. Well, for what it's worth, the standard of review is substantial evidence. It is a fact-finding. They said it's not a fact-finding. This court is to have no deference to the board's finding, and that's just not the case. In national data, the Syfy case does not say that. Nowhere does it count as a substantial evidence standard. Give me your core beef. The confusion is the person who walks in the door and not the person who walks out the other end of the process. My core beef is the person that walks in the door. The confusion is for the person who walks in the door at the outset, not the person who walks out the door at the end of the 30 days. Well, our core beef in this case, this opposition proceeding, has nothing to do with these real-life scenarios that you're putting forth. It's the application which considers, remember, this is an intent-to-use application. I understand, but what I'm talking about is your concession that there would be no likelihood of confusion. Right. If this case was ever to turn into a litigation, and we were to then necessarily address the use of the marks, yes, our concession takes the out-the-door at the end of the process off the table. And then all of those arguments, StoneLion Capital criticizes us for making arguments about pre-investment confusion scenarios. All of those arguments, incidentally, are in response to their argument that you should consider these extra application factors. You don't need to address, those are at the end of our brief, pages 40 to 47. You do not need to get to those. But if you're inclined to disregard legion precedent that what's at issue is the application and not the parties goods, then I ask you to turn your attention to these other arguments that, in fact, would become directly front and center should this ever develop into a litigation. They also argue that we haven't, when we put forth these pre-investment scenarios, that we have not proven that they are likely to occur. But we have proven, and the way we have proven is the DuPont factors. That is how you prove likelihood of confusion in an opposition proceeding. You prove how each of the DuPont factors favors your case and you prove how, on balance, they tip in your favor. That is how we did it and that's how the board found the likelihood of confusion. And then finally, I'd like to leave the court with the several guiding principles that govern all opposition proceedings. While we don't think this is a close case, considering that all the relevant factors tip in favor of likelihood of confusion, to the extent there are any doubts, it is well established by the board and this circuit that all doubts are resolved in favor of the prior user. Newcomers have the obligation to avoid even coming close to pre-existing marks. Thank you very much. Thank you. Shaw, you have a minute and a half. Sure, Your Honor. Let me make two points. First, I think this case boils down to a pure analytical legal question is, can you look beyond the applications when evaluating factor for the conditions of sale and consumer sophistication? Their best case to say no is OCTACOM. OCTACOM in that line of cases is fundamentally different. What you're talking about in OCTACOM in those cases are factors 2 and 3, the description of the services and the trade channels. What's happening in those cases is an applicant is trying to narrow its description by relying on actual marketplace considerations to distinguish themselves from the registrar. We're not doing that. Mr. Shaw, can you tell us that your client will never offer a college education fund? There is absolutely no evidence in the record that suggests our client is planning to do that. I can't say 100% ever, but their burden is by preponderance of evidence to show a likelihood of confusion. They have conceded virtual inconceivable. You can find your client never to offer anything other than the services it's offering now. Your Honor, I'm not prepared to do that, but if my client, to address your concern, tomorrow, if this court were to reverse, started offering other services, they are free to bring an infringement action that takes into account the actual use and say, oh, look, now they're actually doing something that runs some risk of confusion. But on the record now, it's undisputed there is no risk of confusion. Thank you, Mr. Shaw. That concludes our hearing.